**John A. SAYERS, by his guardian ad litem, Clarence J. SAYERS, Appellant,**

v.

**BELTRAMI COUNTY, et al., Charles Wind, et al., Respondents.**

No. C9–90–2654.

Court of Appeals of Minnesota.

June 25, 1991.

Review Granted Aug. 29, 1991.

**658**

Charles H. LeDuc, Shermoen, LeDuc & Jaksa, International Falls, for John A. Sayers, by his guardian ad litem, Clarence J. Sayers.

Gordon W. Myerchin, David M. Box, McElroy, Camrud, Maddock & Olson, Ltd., Grand Forks, N.D., for Beltrami County, et al.

Gregory G. Scott, Minneapolis, for Charles Wind, et al.

Considered and decided by FORSBERG, P.J., and CRIPPEN and KLAPHAKE, JJ.

## OPINION

CRIPPEN, Judge.

Appellant John Sayers sued his foster parents Charles and Eva Wind for negligent supervision after a personal injury occurring when he was three years old. Appellant also sued respondents Beltrami County and Beltrami County Social Services for negligently placing him in the Winds' home, negligently failing to warn the Winds of his hyperactive condition, and vicarious liability for the Winds' negligence. The trial court granted the county's motion for summary judgment, removing it as a party to the suit. We affirm in part, and reverse and remand in part.

## FACTS

On May 6, 1983, while appellant was in foster care at the Winds' home, he suffered a severe arm injury. Appellant was left without supervision and placed his arm in a washer wringer located outside the foster home. Evidence indicates the boy required extraordinary care because he was hyperactive. Dr. Donald Dekrey, a psychologist, diagnosed appellant on March 17, 1983, as "very hyperactive," and suggested prescribing an anti-hyperkinetic such as Ritalin.[1] Betty Curran, the county social worker primarily responsible for appellant's foster placement, was of the opinion that a highly specialized Professional Association Therapeutic Home (PATH) would be appropriate.

Appellant was placed with the Winds on March 29, 1983, after a series of child protection efforts by Beltrami County Welfare Department. The county first became involved with appellant in November 1982 when he was found alone with his sister at a Bemidji hotel. The county provided protective services on a temporary basis and returned appellant to his natural parents. Later that fall, a Bemidji hospital social worker referred appellant to the county while his mother completed a stay at a shelter for battered women. The county assisted in providing day care and transportation services for appellant.

In January 1983, appellant's parents, who are Native Americans living off the Red Lake Indian Reservation, requested that the county provide temporary foster care for appellant. Between January and March 1983, the Red Lake Tribal Court, confirming placement arrangements made by the county, ordered the placement of appellant in three different foster homes. The tribal orders were made following voluntary placement agreements which provided the county would "assume responsibility for giving care and supervision to the child(ren) in a properly licensed foster home." Each temporary placement was terminated because the foster parents could not handle appellant's hyperactivity.

On March 29, 1983, the county transferred appellant to the home of the Winds, Native Americans who live on the Red Lake Indian Reservation. Because the child is a member of the Red Lake Indian Tribe, beginning in January 1983 the county reported its placements to the tribe by letter. Again in February, after placement, the county reported to the tribe. In March 1983, in addition to executing another agreement for voluntary placement of the child, the county obtained a tribal court order confirming foster placement with the Winds. In its order granting the Winds temporary custody, the tribal court stated

1. A physician later determined that appellant was too young to receive drug treatment.

that it was in appellant's best interests to be placed in foster care "through the Beltrami County Welfare Department."

After his injury, appellant brought this action against the county and the Winds. The county moved for summary judgment, arguing only that appellant failed to state a cause of action against the county because any injury was attributable to the conduct of the foster parents. In response to this motion, the trial court explored sua sponte whether claims against the county were adversely affected by the tribal court's jurisdiction to confirm the county's foster care placement. Although this topic was neither introduced, briefed, nor argued by the parties, the trial court found it dispositive, concluding that tribal court jurisdiction negated any alleged duty of county personnel. The court further concluded, also sua sponte, that discretionary immunity for public officials was sufficiently broad to protect the county against claims stated here. Finally, the court agreed with the county that the risk of injury from a washer wringer was not one the county could foresee, and that the county could not be vicariously liable for the conduct of the Winds.

### ISSUES

1. Does the jurisdiction granted to the tribal court under the Indian Child Welfare Act bar a negligence claim against the county?

2. Are the county's foster placement decision and its conduct in monitoring the foster parents protected by discretionary immunity?

3. Was appellant's injury unforeseeable as a matter of law?

4. Can the county be vicariously liable for the acts of foster parents?

### ANALYSIS

On appeal from a summary judgment, the reviewing court must determine whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium, Inc.*, 281 N.W.2d 328, 330 (Minn.1979).

1. *Indian Child Welfare Act.*

■ The trial court concluded sua sponte that the tribal court's jurisdiction over appellant's placement was determinative of the county's duty of care. The dissenting opinion on review embraces the same conclusion. Numerous considerations dictate a contrary conclusion.

First, although the tribal court exercised jurisdiction in the case, it specifically delegated to the county the responsibility for foster care. The foster care stated in the tribal court's order was care "through the [county agency]." The county accepted without evident conditions the duty given it by the trial court. The Indian Child Welfare Act (ICWA) gives the Indian tribe exclusive jurisdiction over child custody proceedings involving tribal children. 25 U.S.C. § 1911(a) (1982). In asserting exclusive jurisdiction, the tribal court may establish the following relationships with the state:

> States and Indian tribes are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for concurrent jurisdiction between States and Indian tribes.

25 U.S.C. § 1919(a) (1982). Section 1919(a) specifically contemplates an arrangement such as the one between the tribal court and the county here. *See also* Minn.Stat. § 257.353, subd. 5 (1990) (current law, part of Minnesota Indian Family Preservation Act, stating authority of Minnesota human services agency to enter into agreements to furnish care and custody of Indian children under section 1919(a)). Moreover, it is undisputed here, as confirmed in the county's own portrayal to the trial court on its duties, that its task in assisting tribal members is part of its general child protection role under state law.

Second, independent of the county's agreement, it is legally compelling that the county practiced the exclusive role in providing foster care services in the case. Tribal court jurisdiction, like any court jurisdiction in child protection matters, is over "proceeding[s]," not over administration of protection or treatment programs, especially those for residential care. 25 U.S.C. § 1911(a) (1982); *see* 25 U.S.C. § 1903(1)(i) (1982) (defining "foster care placement" in "proceeding" as action of removing child from custody of parents); *see also Welfare of M.D.A. v. State*, 306 Minn. 390, 394–95, 237 N.W.2d 827, 829 (1975) (declaring separate roles of juvenile court and corrections authorities); *Smith v. Organization of Foster Families*, 431 U.S. 816, 859, 97 S.Ct. 2094, 2117, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring) (discussing limited due process implications in unfettered agency control of foster care after voluntary or judicial placement). Nothing in the tribal court's exclusive jurisdiction over a placement decision precludes the caretaking duty of state agencies that furnish foster care service for a tribal child. Moreover, the evidence suggests nothing to distinguish efforts the county made here and the like efforts it would make in a case where tribal court jurisdiction did not exist. As the only active agent in administering placement and providing care for the child, the county cannot escape liability for alleged nonfeasance by reference to placement authority of the tribal court.

Third, the county in this case assumed direct responsibility for the care of the child in voluntary foster home placements, independent of any action of the tribal court. Three times, most recently on March 29, 1983, the county executed a voluntary placement agreement with appellant's parents where the parents consented to placement by the county and the county in return explicitly agreed to "assume responsibility for giving care and supervision to the child" and promised "to provide adequate care" for the child. Voluntary placement agreements are transactions permitted by Minnesota law, commonly employed in the child protection work of all Minnesota county agencies, and are categorically

independent of judicial authority, including tribal court authority under the Indian Child Welfare Act. *See* Minn.Stat. § 257.-071 (1982) (conditions on voluntary placement arrangements); 12 Minn.Code Agency R. § 2.204 B.6 (1982) (defining voluntary placement); 12 Minn.Code Agency R. § 2.204 C.1(b)(2) (1982) (agency responsibilities in voluntary placements); *Smith*, 431 U.S. at 824, n. 9, 97 S.Ct. at 2099, n. 9 (observing evidence that 80% of New York City foster care placements are by agreement of parents and agency); *see also* Minn.Stat. §§ 257.351, subd. 17, and 257.-353 (1990) (current law recognizing and regulating voluntary agreements for publicly controlled foster care of Indian children).

The record shows placements in January and February occurred through administrative action of the county without prior judicial proceedings. The tribal court's only involvement was upon receipt of notice from the county after the fact. Thereupon, the role of the tribal court was confined to the topic of legal authority for the placement. If its responsibility is germane at all to the case, it is limited to the removal and placement decisions, not the furnishing of the foster care.

Two related contentions, one by the trial court and one in the dissenting opinion on review, require attention.

We note an observation by the trial court that the county acted under tribal court regulations. According to the record, however, the only pertinent tribal regulations concern certification of the Winds as parents who could provide general foster care services. These regulations do not deal with training, supervision, or monitoring foster care services. They do not address the responsibilities of foster parents. They suggest no excuse for failing to properly supervise foster care, or to assume that general foster care services, without special training or supervision, are sufficient to care for a child with unique needs.

On review, the dissenting judge introduces to the proceedings a public policy

consideration which has not been addressed by the parties or the trial court. It is stated in the dissenting opinion that recognition of a duty for county authorities will be harmful to Native American children by prompting public agencies to refuse assistance on their behalf. The prospect for neglect by the county of public responsibility toward these children is purely speculative. More to the point, the contention rests tenuously on the assumption that court services for Indian children are optional. As already noted, it is an undisputed matter of record that the county admits its role in helping these children is part of its child protection responsibility mandated by state law. The duties recognized here are no different than those faced by the county in dealing with children who are not tribal members.[2] Absent discriminatory practices prohibited by law, there is no reason to forecast that recognition of a duty of care will prompt county personnel to disregard Native American children although assuming general duties of care in dealing with other children. Moreover, recognition of a duty toward Indian children like the duty to others constitutes a public policy consideration properly served by the decision here.

### 2. *Discretionary Immunity.*

■ Municipalities are subject to liability for the torts of their employees acting within the scope of their employment. Minn.Stat. § 466.02 (1982). An exception to this general rule is the doctrine of discretionary immunity, which precludes municipal liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn.Stat. § 466.03, subd. 6 (1982). Although "almost every act involves some measure of discretion, * * * not every act of government is entitled to discretionary immunity." *Cairl v. State,* 323 N.W.2d 20, 23 (Minn.1982). Discretionary immunity must be construed narrowly because it is an exception to the general rule of governmental liability. *Larson v. Independent School Dist. No. 314,* 289 N.W.2d 112, 121 (Minn.1979).

■ The purpose of the discretionary immunity exception is to preserve the separation of powers by assuring that "the courts do not pass judgment on policy decisions entrusted to coordinate branches of government." *Holmquist v. State,* 425 N.W.2d 230, 231 (Minn.1988). Thus, the exception applies only where the municipality proves that the conduct at issue is of a policymaking nature, involving a balancing of social, political, or economic considerations. *Nusbaum v. Blue Earth County,* 422 N.W.2d 713, 722 (Minn.1988). Discretionary immunity may not, however, protect the implementation of an already established policy, because even though implementation may require professional or scientific judgments, it may not require the balancing of policy factors. *El Ela v. State,* 468 N.W.2d 580, 581 (Minn.App. 1991) (citing *Holmquist,* 425 N.W.2d at 234). Conduct at this operational level is less likely to involve policymaking decisions and ordinarily will not be protected. *Nusbaum,* 422 N.W.2d at 722. The central inquiry in determining whether governmental conduct is protected is whether the challenged action involved a balancing of policy objectives. *Id.*

Confining its attention to the county's choice to place the child, the trial court found sua sponte that the county was entitled to discretionary immunity. Indeed, with regard to removal and placement, we agree with the trial court. The rationale for this decision, however, produces a different result when applied to the county's conduct in preparing the foster parents for meeting the unusual needs of this child, assisting them in this task, and monitoring their conduct.

### a. Placement Decision.

■ In *Cairl,* the supreme court determined the state was entitled to immunity

---

**2.** The Minnesota Indian Family Preservation Act, adopted in 1985, now provides for local social service agency participation in foster care services for Indian children. 1985 Minn.Laws, ch. 111, §§ 1–8 (codified as amended at Minn. Stat. §§ 257.35–.3579 (1990)).

for the decision to release a mental patient because the threat of liability would frustrate the state's policy of open-door treatment of the mentally ill. *Cairl,* 323 N.W.2d at 23–24.

> The decision to release [the patient], involving as it does the professional evaluation of such factors as the protection of the public, [the patient's] physical and psychological needs, the relative suitability of the home environment, and the need to reintegrate [the patient] into the community, is precisely the type of governmental decision that discretionary immunity was designed to protect from tort litigation by after-the-fact review.

*Id.* at 23.

The removal and placement decisions here are like the policy decision in *Cairl.* On one hand, placement authorities must consider the public interest in providing the best possible care for the child, but on the other hand, they must take into account the cost of care and availability of services. Because this professional judgment is based on a balancing of policy objectives, it is immune as a discretionary decision.

Appellant contends that immunity does not apply to the county's involvement in the placement decision because the decision violated specific regulatory standards. In particular, appellant contends state regulations governing this situation required placement with parents possessing "more than ordinary abilities" able to provide "extraordinary care." [3] This standard, however, is not a categorical duty, but only one of a number of policy considerations necessarily considered in making decisions in removal and placement. Thus, any county

involvement in the placement decision still falls within its discretionary immunity.

**b. Placement Administration.**

■■■ The county's care in administering the placement and subsequent care of the child is subject to other immunity determinations.

■■■ Even if made in the performance of policymaking tasks, an official's decision may carry with it affirmative governmental duties that do not enjoy discretionary immunity. *See McCorkell v. City of Northfield,* 266 Minn. 267, 271, 123 N.W.2d 367, 370–71 (1963) (pre-Torts Claim Act case holding that no immunity attaches when governmental entity violates express statutory obligation to have custodian present when a prisoner is detained). In contrast, the *Cairl* court justified the grant of discretionary immunity in part because the state was not under any positive statutory obligations, including a duty to warn, when it chose to release the patient. *Cairl,* 323 N.W.2d at 24–26. Initially, we observe that the county unconditionally undertook a caretaker role in utilizing foster home services for appellant, evidenced here by the county's explicit agreement with the parents to assume responsibility for giving care and supervision to the child. Evidence gives rise to a genuine issue whether this role was fulfilled here without due care.[4] In addition, evidence in the record would permit a finding of numerous specific violations of regulatory standards. There is evidence the foster parents were not told appellant had been diagnosed by a psychologist as very hyperactive and were not given training in special supervision necessary for a child with this condition.[5] Also,

---

**3.** 12 Minn.Code Agency R. § 2.001 J. (1982) requires that special services homes meet additional requirements because "[c]hildren with special needs require a special understanding. * * * [P]roviders who undertake to care for these children must possess more than ordinary abilities. Such children require extraordinary care." (comments to rule).

**4.** The present case therefore is distinguishable from *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the court held that the county owned no fourteenth

amendment duty to affirmatively act to protect a child from beatings by his father. *Id.* at 200–03, 109 S.Ct. at 1006–07 (recognizing, however, that the county may have had a state tort law duty toward the child). In contrast, Beltrami County did affirmatively act in assuming responsibility for appellant, and appellant has not alleged any constitutional violations.

**5.** *See* 12 Minn.Code Agency R. § 2.204 C.1(g)(4) (1982) (local service agency must provide foster home with pertinent health data of the child); 12 Minn.Code Agency R. § 2.001 J.1 (requiring foster parents who wish to care for children

regulations governing the county set forth numerous tasks of assistance, supervision and monitoring which are the subject of disputed evidence in this case.[6]

This case also requires reference to developing law on the implementation roles of public officials. The conduct of social services personnel in administering the child placement and subsequently working with the foster parents is strictly in a category of policy implementation, not policy creation. *See Nusbaum*, 422 N.W.2d at 723 (placement of speed zone sign involved no balancing of policy objectives and was, therefore, not immune); *El Ela*, 468 N.W.2d at 582 (police officer's implementation of hand signaling policy during air-to-ground speed enforcement not immune); *Pletan v. Gaines*, 460 N.W.2d 74, 77–78 (Minn.App.1990) (police officer's implementation of high speed motor vehicle chase policy not immune), *pet. for rev. denied* (Minn. Nov. 1, 1990). *Invest Cast, Inc. v. City of Blaine*, 471 N.W.2d 368, 370–371 (Minn.App.1991) (fire department is not immune from liability for the methods used in firefighting).

We note here, as we have before, that some implementation decisions are protected by immunity. *See El Ela*, 468 N.W.2d at 582 (discussion of exceptions).

Most significantly, *Cairl* extends immunity to implementation decisions essential to government policymaking. *Cairl*, 323 N.W.2d at 23–24. Clearly, however, implementation decisions premised only on safety concerns are not immune from scrutiny. *Nusbaum*, 422 N.W.2d at 721; *El Ela*, 468 N.W.2d at 582; *Pletan*, 460 N.W.2d at 77. Child care service decisions, like those based on safety concerns, may be scrutinized without frustrating the well-established governmental function of protecting children.

### 3. *Foreseeability.*

The trial court granted summary judgment in part because it determined that the county had no direct control over the washing machine used by the Winds, and could not foresee an injury to the child in contact with that appliance. Foreseeability does not require that the tortfeasor be able to foresee the exact nature of the plaintiff's injuries or the precise manner in which they occur. *Foss v. Chicago, B & Q Ry. Co.*, 151 Minn. 506, 508, 187 N.W. 609, 610 (1922). We stated earlier the several duties of the county for care in use of foster care services, including proper disclosures, training, assistance and monitoring by the agency.[7] There was am-

---

with special needs to "have structured opportunities for achieving knowledge and skills necessary and pertinent to [the child's] specific special need").

**6.** Appellant contends several regulations imposing affirmative duties on the county were violated: 12 Minn.Code Agency R. § 2.001 (1982) (governing qualifications, training and evaluation of foster parents); 12 Minn.Code Agency R. § 2.204 (1982) (governing the administration and provision of foster care services to children by the local social service agency when the agency has placement and supervisory responsibilities).

**7.** *See supra* notes 3 and 4. The county social service agency must visit the family foster home (FFH) at least once per month for the first six months after the first placement, 12 Minn.Code Agency R. § 2.001 D.2(b) (1982); and once a year thereafter. 12 Minn.Code Agency R. § 2.001 D.2(c) (1982). The agency must make training opportunities available to the FFH providers. 12 Minn.Code Agency R. § 2.001 D.2(e) (1982). This training must include six hours of

orientation prior to receiving the first child in placement; 12 Minn.Code Agency R. § 2.001 D.7(a) (1982); and an additional twelve hours of training annually. 12 Minn.Code Agency R. § 2.204 D.7(c) (1982). The agency must establish an individual record for the FFH, including the foster parent agreement form, the prelicensing study, annual evaluations of the FFH, and records of training received by the foster parents. 12 Minn.Code Agency R. § 2.001 I.1 (1982). The agency must also keep individual case records for children placed in foster care. 12 Minn.Code Agency R. § 2.001 I.2 (1982).

The regulations governing the administration and provision of foster care services establish additional agency duties. The agency must provide help to the child and foster parents in initially adjusting to the FFH, and follow-up on the placement on a regular basis. 12 Minn. Code Agency R. § 2.204 C.1(f) (1982). The agency must provide for meeting the child's health needs by assuring that the child has a health examination prior to placement and that his ongoing needs health needs are met. 12 Minn.Code Agency R. § 2.204 C.1(g)(1)–(2) (1982). The agency must provide the foster

ple evidence of foreseeable harm to this child due to the breach of these duties. In the assessment of evidence on foreseeability and causation, we are mindful of the legal standards governing summary judgments; we must view the evidence in the light most favorable to appellants, and summary judgment is inappropriate if the disclosed evidence shows a genuine issue. *Sauter v. Sauter*, 244 Minn. 482, 484–85, 70 N.W.2d 351, 353 (1955).

Respondent argues similarly that summary judgment would be appropriate here because causation for the injury traced solely to the conduct of the foster parents, not the county. This argument also erroneously disregards the breadth of evidence on the duties of the county in administering the foster care arrangement. These duties are germane to improved care and reduced risk of harm to children. Risk of injury to a hyperactive child is evident, and improved care of such a child reduces this risk. More particularly, there is ample evidence here permitting a factfinder to conclude that the child's injury could have been avoided by reasonable efforts to restrict his unattended activity.

### 4. Vicarious Liability.

■ The trial court concluded that the Winds were not employees of the county, and that vicarious liability depended on this status. Under governing law, we agree that the foster parents act as independent contractors. *See Kern v. Steele County*, 322 N.W.2d 187, 189 (Minn.1982) (foster parents act as independent contractors, not employees of municipality). Appellant contends *Kern*, which was decided by a divided court, has become obsolete because the extensive number of regulations presently require unusual control by agencies over foster care services. Although this argument is telling, we do not have the prerogative to disregard the 1982 Minnesota Supreme Court decision in *Kern*.

Respondents suggest that there can never be vicarious liability for the conduct of independent contractors. However, the issue of vicarious liability is not resolved solely by deciding the status of foster parents as independent contractors. Under Minnesota law, an employer may be responsible for conduct of an independent contractor. *Lamb v. South Unit Jehovah's Witnesses*, 232 Minn. 259, 263, 45 N.W.2d 403, 406 (1950) (noting that the general rule of nonliability for the conduct of independent contractors is merely "a preamble to the catalog of its exceptions") (quoting *Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co.*, 201 Minn. 500, 503, 277 N.W. 226, 228 (1937)).

■ *Kern*, while deciding the status of foster parents, did not determine an employer's vicarious liability for an independent contractors' torts. *Kern*, 322 N.W.2d at 189 (concluding that county's insurance policy covering "employees" did not extend to foster parents). We conclude that the exceptions to the general rule of nonliability for the negligence of independent contractors do not apply in this case. *Lamb* is distinguishable as a case where an employer was vicariously liable for the tort of an independent contractor under the nondelegable duty doctrine. *Lamb*, 232 Minn. at 263, 45 N.W.2d at 406 (owner of premises has an absolute, nondelegable duty to the public to ensure premises are safe, and thus can be liable for work negligently performed by independent contractors).

parents with "pertinent health data" about the child. 12 Minn.Code Agency R. § 2.204 C.1(g)(4) (1982).

The regulations impose additional requirements on special services homes. Individuals licensed for special services "must have structured opportunities for achieving knowledge and skills necessary and pertinent to specific special need or handicap." 12 Minn.Code Agency R. § 2.001 J.1 (1982). These skills must be obtained either by (1) three years experience plus twelve hours of special training; or (2) one year experience with special needs children plus six hours of training; or (3) 25 hours of training. 12 Minn.Code Agency R. § 2.001 J.1(a)–(c). Within 30 days after placement of a special needs child, the agency must develop a written individualized program plan with the FFH provider, which must be updated every six months. 12 Minn.Code Agency R. § 2.001 J.2 (1982). The agency must make known to the FFH community resources and services for the special needs child. 12 Minn.Code Agency R. § 2.001 J.3 (1982). The agency must develop a plan for time-off for the special services FFH providers. 12 Minn.Code Agency R. § 2.001 J.4 (1982).

Here, no such all-encompassing duty is present.

### DECISION

We affirm the trial court's holding that the county has no vicarious liability for the acts of the foster parents. We also affirm the conclusion that the county's conduct in placing the child in foster care is protected by the doctrine of discretionary immunity. We reverse the conclusions (1) that the Indian Child Welfare Act precludes liability; (2) that the county is immune from suit for its conduct in monitoring and administering the foster placement; and (3) that appellant's injury was unforeseeable as a matter of law. The matter is remanded for trial proceedings.

Affirmed in part, reversed in part and remanded in part.

FORSBERG, Judge (dissenting):

I respectfully dissent.

1. The Indian Child Welfare Act (ICWA) gives the tribe *exclusive* jurisdiction over foster care placements of Indian children. 25 U.S.C.A. § 1911 (1990). The county assisted the tribe in making placements but had no authority, de jure or de facto, to do so unilaterally.

As the district court properly reasoned, the ICWA obviates negligence claims because it imposes no legal duty on the county in tribal court jurisdiction cases. The county lacks the requisite legal duty for negligence because it lacks the concomitant authority, both as to the child and the providers, to avoid the complained of harm.

The ICWA demands placements of Indian children be made in the Indian community. Even where the state is "actively servicing" the Indian child, the authority and jurisdiction as to the child remains with the tribal court. The majority's interpretation of the county's powers under the ICWA impermissibly expands a county's power in these placements. The majority reasoning would allow the county to appropriately, unilaterally place the child in a special group home for hyperactive children outside the Indian community. Such a view of the act runs counter to the carefully and explicitly reasoned policy concerns of Congress in crafting the ICWA. State courts should beware of meddling in this issue where even slight deviations may yield far-reaching and unwelcome results. *See* Argument; *Legisprudential Considerations in Unraveling the Safety Net: Food Stamps, Foster Care and the Indian Child Welfare Act,* 4 J. Law and Inequality 667 (1986) (illustrating unintended effects, counter to legislative intent of the ICWA, as a result of administrative fiat).

Further, the majority mentions only peripherally one of the key factors the district court relied upon in finding the county owed no legally cognizable duty in this case. The child was placed in a home licensed by the tribe, not the county. Even if the county were dissatisfied with the care and supervision of the child in the placement, it could take no action against the Winds' foster care license in response. The county had no authority to make onsite inspections or in any way physically supervise the placement. The Winds lived on the reservation and, like the child, were under the exclusive jurisdiction of the tribal court.

The majority seems to find fault with the county's actions because they differed from those that may have been taken in a case where there was no tribal court jurisdiction. While this concern with uniform treatment is usually laudable, it is mistaken here. The ICWA's legislative scheme invests tribes with complete authority in the care and maintenance of Indian children and contemplates a minimum of outside interference. The differing levels of county involvement between Indian and non-Indian foster care placements is an intended consequence of the act. This same deference, counter to the majority's contention, is shared in Minnesota law when dealing with cases like John Sayers'.

The majority cites the Minnesota Indian Family Preservation Act (MIFPA), Minn. Stat. 257.35–.3579 (1990), in support of its position that the county assumed legal duties in the context of a "voluntary foster care placement." Such placements involve

participation of county social service agencies which result "in the temporary placement of an Indian child *away from the home of the child's parents or Indian custodian* in a foster home, * * * and the parent or Indian custodian may have the child returned upon demand." Minn.Stat. § 257.351, subd. 17 (1990) (emphasis added). In this case, the child was in the home of an "Indian custodian" as defined by Minn.Stat. § 257.351, subd. 8. Given the broad "demand" authority residing with the Native American community in "voluntary foster care placements," I question whether there is any diminution in the tribe's ultimate authority even where the provision applies. Beyond doubt, this section of the MIFPA is without moment here, where it does not even apply.

Minnesota law does not, as the majority infers, provide for any county action independent of the tribal court, particularly when the placement is made with Native American custodians, licensed by the tribe, and residing on a reservation. Our statute, mirroring the ICWA, provides,

> An Indian tribe with a tribal court has exclusive jurisdiction over a child placement proceeding involving an Indian child who resides within the reservation of such tribe at the commencement of the proceedings. When an Indian child is in the legal custody of a person or agency pursuant to an order of a tribal court, the Indian tribe retains exclusive jurisdiction, notwithstanding the residence or domicile of the child.

Minn.Stat. § 257.354, subd. 1 (1990). MIFPA only provides a limited role for counties in making foster care placements, and this role is not invested with any actual authority over the placement. In placements within the tribal setting, local agencies are only required to be given notice and "an opportunity to be heard regarding the placement." Minn.Stat. § 257.354, subd. 4. This is hardly a broad grant of authority.

The provisions in the ICWA and MIFPA providing for "orderly transfer of jurisdiction" or "concurrent jurisdiction," cited by the majority must be read narrowly and in the context of the public policy goals of the Acts. Surely they cannot be extended to placements such as this, wholly within the Native American community, where the tribe *never* relinquished jurisdiction.

I find no basis for holding the county negligent where it has less than full and absolute authority to take steps to regulate and control its foster care activities. Sadly, in light of the majority's decision, I fear no county in this state will likely agree to provide any foster care services to tribal courts if the county is exposed to liability without concomitant control. This untoward result runs not only counter to the ICWA's encouragement of a *limited* county role, but against the interests of these children as well.

2. In addition to finding no duty as a matter of law, I fail to see how any reasonable person could find the county was responsible for any breach proximately causing the child's injuries. Two are alleged. First, it is claimed the county somehow failed to warn the Winds of the child's hyperactivity. However, Mrs. Wind testified she recognized the child was hyperactive. Mrs. Wind is a licensed practical nurse who has experience working with hyperactive children. Where, through whatever means, knowledge is possessed sufficient to provide warning, there is no legal duty to warn. *Leuer v. Johnson,* 450 N.W.2d 363, 366 (Minn.App.1991), *pet. for rev. denied* (Minn. Mar. 16, 1991). This situation is reminiscent of negligent nondisclosure claims in a medical malpractice context. There, a patient's own medical expertise reduces the amount of information needed to permit a patient to make an intelligent decision concerning surgery. *Kiniken v. Heupel,* 305 N.W.2d 589, 595 (Minn.1981). Mrs. Wind had actual knowledge of the possibility of the harm that befell John Sayers. The record is absolutely devoid of any evidence that had the county informed Mrs. Wind of the clinical diagnosis of hyperactivity, her actions on the day of the injury would have differed.

Second, it is alleged the county somehow negligently supervised the placement. It is unclear what the majority would have the county do in this regard. Should they have

issued daily activity plans for Mrs. Wind and the child? In this case, such a plan would have required such specificity as to detail, literally, such as when Mrs. Wind could go to the bathroom! Would the majority have the Winds remove all possible dangers to a hyperactive two-and-a-half year old child? In this regard, I fully agree with the district court, which aptly stated:

A government agency cannot place foster children in situations without any risk of injury. Chemicals, automobiles, knives, electrical appliances, fireplaces, and bathtubs are only a few of the common hazards associated with living in modern society and which are impractical to forbid in foster homes. Furthermore, a county agency cannot match its wards to facilities which will provide for all of their various and, at times, contradictory needs. Setting such a standards would be impracticable and would impede the provision of governmental services designed to improve the safety in living standards of citizens.

Under such circumstances, it seems the only way the county could have avoided negligence is to demand the child be penned up under lock and key 24 hours a day.

In fact, Mrs. Wind had warned the child to stay away from the washing machine wringer. However, we must further keep in mind this was a two-and-a-half year old child. The child's injury was not the type the boy was particularly susceptible to because of his hyperactivity. As any parent of a normal, active, two-and-a-half year old child can attest, the possibility of this sort of tragedy is not limited to hyperactive children. The danger to which the child was exposed is one attendant to the care of all two-and-a-half year old children. I fail to see when the majority would ever preclude the possibility of a county's liability for negligent supervision where an infant is involved, hyperactive or not. There is no causal nexus between the particular, allegedly negligently supervised danger and the injury. I'm afraid the majority ignores the time honored doctrine that "[w]hether a particular act, or a failure to act, has, wholly or in part, proximately caused an acci-

dent depends in the last analysis on the application of common sense to the facts of each case." *Johnson v. Chicago Great Western R.R. Co.*, 242 Minn. 130, 134, 64 N.W.2d 372, 376 (1954).

In the final analysis, there was no duty; there was no breach; there was no causation. Rather there was a tragic injury and a frantic, tortured search for a deep pocket. While I sincerely hope this poor child may be somehow recompensed for this injury, I believe allowing liability against the county is a shortsighted means of achieving that goal. It runs counter to the policy and dictates of the Indian Child Welfare Act; discourages county assistance in future Indian foster care placements; and generally obviates long standing, recognized principles of tort law.