John A. SAYERS, by his Guardian Ad
Litem, Clarence J. SAYERS,
Respondent,

v.

BELTRAMI COUNTY, et al.,
Petitioners, Appellants,

Charles Wind, et al., Respondents.

No. C9–90–2654.

Supreme Court of Minnesota.

March 6, 1992.

Gordon W. Myerchin, Grand Forks, N.D., for appellants.

Charles H. LeDuc, Shermoen, LeDuc & Jaksa, International Falls, for John Sayers.

Gregory G. Scott, Joy Condon, Minneapolis, for Charles Wind, et al.

SIMONETT, Justice.

This is an action by an Indian child against a county and its social services agency for injuries received while in a foster home on an Indian reservation. The trial court granted the county and its social services agency summary judgment. The court of appeals reversed in part. For the reasons herein given, we reverse and reinstate the summary judgment.

Plaintiff John Sayers is a member of the Red Lake Indian Tribe, as are his parents, Clarence Joseph Sayers and Janet Blue. On May 6, 1983, John, then 2½ years old, was staying at the foster home of Charles and Eva Wind on the Red Lake Indian Reservation and was injured when he put his hand in the wringer of a washing ma-

chine that was on the Winds' lawn. Eva Wind had been washing clothes out on the lawn when she decided to go in the house to use the bathroom. She turned the washer off, but did not unplug it. She told John to stay away from the washer and brought him in the house with her. She left the child outside the bathroom door in the kitchen with a comic book to occupy him. Prior to this time, Mrs. Wind had never had a problem with John going outside while she used the bathroom. While Mrs. Wind was in the bathroom, John left the house, turned on the washer, and placed his hand in the wringer. Eva was in the bathroom about 5 to 7 minutes.

John Sayers sued the Winds, Beltrami County and Beltrami County Social Services (the County). The claims against the County were initially vague but eventually emerged as negligent placement of the child in the foster home, negligent supervision and attention after placement, and vicarious liability for the Winds' alleged negligence. To understand these claims, we need to relate the circumstances which brought John to the Winds' home.

During the preceding fall of 1982 the County had provided temporary protective services for John and his younger sister after they were found in a Bemidji motel abandoned by their parents. Later that fall the County again provided temporary care for the two children off the reservation while the mother was in a battered women's shelter. In early January 1983 the parents were in a car accident and requested the County to provide temporary placement. The children were placed in the home of Mr. and Mrs. Maier in Bemidji. The County prepared a Temporary Placement Agreement, signed by the parents, which provided that the County would assume responsibility for the care and supervision of the children. The County also prepared a Foster Placement Plan and reported the temporary placement to the Red Lake Tribal Council. By orders of the Tribal Court, temporary custody was first given to Clarence Sayers but then changed to Janet Blue.

At the end of January the children were returned to Janet Blue at the request of both parents. The County received reports that Janet was drinking and never home, and on February 21, 1983, the two children were again placed in foster care at the Maier home in Bemidji, with legal custody still in Janet Blue. Again, a Temporary Placement Agreement was executed and the placement reported by the County to the Tribal Court.

On March 10, apparently at the request of Clarence Sayers, the children were transferred to the Red Lake Indian Reservation. Once on the reservation, the Tribal Social Services (created about this time to replace the Bureau of Indian Affairs in providing social services) took over. Beltrami County also maintains a branch office on the reservation with social worker Betty Curran in charge.

From March 12 to March 29, 1983, John stayed temporarily at the home of Mr. and Mrs. Sumners on the reservation. On March 17, Betty Curran and Mrs. Sumners took John to see Dr. DeKrey, a psychologist in Bemidji. The doctor found John to be "very hyperactive" and noted the boy's destructive behavior while in his office. Dr. DeKrey recommended a medication called Ritalin, but this recommendation was rejected by the medical doctor who saw John a day or two later because of John's tender age.

Meanwhile Clarence recommended that John be placed with Charles and Eva Wind. The Wind home was not licensed for foster care, so a person from Tribal Social Services conducted an investigation and the Wind home was then licensed by Tribal Social Services. On March 29, 1983, the Tribal Court issued an order reciting that John be placed in foster care "through the Beltrami County Welfare Department," and ordering temporary custody of John to Charles and Eva Wind.

Betty Curran provided copies of John's psychological reports to Tribal Social Services, so it was aware of John's behavioral problems when it licensed the Wind home and recommended John's placement there. Apparently Betty Curran felt John might

better be in a PATH home (Professional Association's Therapeutic Home), where the foster parents are professionally trained to work with troubled children, but there were no PATH homes on the reservation.

After March 29, John was at the Wind home. It was about 5 weeks later, on May 6, that John had his accident with the washing machine. Prior to the child's placement in the Wind home, Betty Curran had not visited the home but had spoken to Mrs. Wind twice, essentially about discipline and raising foster children. After placement, Betty Curran visited the Wind home three times. She does not recall having told the Winds about Dr. DeKrey's report or of John's hyperactivity, but believes she did mention that John might be put on Ritalin. She felt that the Winds should have a chance to know John and learn his personality, "[b]ecause every parent handles a child that's real active differently." Eva Wind testified that she had not been informed of John's diagnosis as hyperactive; however, she had met John before he was placed in her home and, because she was a licensed practical nurse who had worked with hyperactive children before, she knew John was hyperactive from the first time she observed him. Mrs. Curran testified she had noticed the wringer washing machine on the Wind lawn, but said she considered this to be an ordinary household item, common on the reservation. After the accident, John remained with the Wind family until at least October 1987.

Subsequent social service records indicate several instances when the Tribal Court ordered visits or gave legal custody to the parents against the recommendation of Betty Curran. In April 1984 the County prepared a Foster Placement Plan for John but there was never a Temporary Placement Agreement, like in the early Bemidji placements. In 1986, the Tribal Court, at Clarence Sayers urging, requested Betty Curran's removal from John's case. Tribal Social Services refused, however, to provide ongoing casework services because of a lack of funds and indicated it was well satisfied with Betty Curran's services.

As previously indicated, the trial court granted summary judgment for Beltrami County, reasoning that (1) the Indian Child Welfare Act barred a suit against the County; (2) in the alternative, the doctrine of discretionary immunity protected the County from tort liability; (3) foster parents are not employees of the County, so vicarious liability is unavailable; and (4) in any event, as a matter of law, the County could not have foreseen the child's injury.

The court of appeals affirmed in part and reversed in part. It agreed with the trial court that discretionary immunity protected the County from a claim for negligent placement and that foster parents are not agents of the County for purposes of vicarious liability; however, the appeals panel (2-to-1) found that the Indian Child Welfare Act did not bar a suit against the County and discretionary immunity did not protect the County from a suit for negligent administration, *i.e.*, for negligent care, supervision and monitoring. Finally, the court found "ample evidence of foreseeable harm to this child." *Sayers v. Beltrami County*, 472 N.W.2d 656, 664–65 (Minn. App.1991). The dissent argued that the Indian Child Welfare Act did foreclose any suit against the County and, in any event, as a matter of law, there was on the part of the County no duty, no breach and no causation.

We granted the County's petition for further review. Plaintiff Sayers does not seek review of those portions of the court of appeals' decision adverse to him. Defendants George and Eva Wind did not move for summary judgment and have taken no part in this appeal.

I.

■ The first issue is whether the Indian Child Welfare Act bars a negligence action against the County.

A.

In 1978, Congress enacted the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq., in response to a growing concern that Indian children were being placed in non-Indian foster and adoptive homes, thereby depriv-

ing them of their unique culture. Congress noted that the states, exercising their jurisdiction over Indian child custody proceedings, "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5) (1982). To remedy this problem, Congress provided exclusive jurisdiction of child custody proceedings in the tribe:

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law.

§ 1911(a). Under the Act, "child custody proceeding" includes among other things a "foster care placement," which means any removal of an Indian child from its parent for temporary placement in a foster home where the parent cannot have the child returned upon demand, but where parental rights have not been terminated. § 1903(1)(i).

Although Congress allowed Indian tribes to exercise exclusive jurisdiction, significant for our purposes here, it also authorized the tribes to make agreements with states if they so desired:

> States and Indian tribes are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis and agreements which provide for concurrent jurisdiction between States and Indian tribes.

§ 1919(a).

The Minnesota Indian Family Preservation Act, Minn.Stat. §§ 257.35–.3579 (1990) parallels the federal act. Under § 257.354, subd. 1, an "Indian tribe with a tribal court has exclusive jurisdiction over a child placement proceeding involving an Indian child who resides within the reservation of such tribe at the commencement of the proceedings." The definition of "child placement

proceeding" is essentially the same as that of "child custody proceeding" under the federal act. See Minn.Stat. § 257.351, subd. 3(b).

The Minnesota act requires a different role for the county service agency when dealing with *voluntary* foster care placement. Minn.Stat. § 257.353. Voluntary foster care placement is slightly different than child placement proceedings. The former is defined as "a decision in which there has been participation by a local service agency or private child placing agency resulting in the temporary placement of an Indian child away from the home of the child's parents or Indian custodian in a foster home * * *, and the parent or Indian custodian *may have the child returned upon demand."* Minn.Stat. § 257.351, subd. 17 (emphasis added). For a voluntary placement, the local social service agency must notify the tribal social service agency of the placement. Minn.Stat. § 257.353, subd. 2. Thus, voluntary foster care placement assumes that the County is handling the placement, not the Tribe, and that the parent or custodian has consented and has the right to demand the child's return.

### B.

■ It is important in this case to separate the County's role in placing John Sayers in foster care off the reservation and its role at the Wind home on the reservation. Initially, John and his parents resided off the reservation. The Red Lake Tribe at this point did not have exclusive jurisdiction over the off-reservation proceedings. Because the placements were voluntary and the parents retained legal custody, the County acted in accord with the provisions of Minn.Stat. § 257.353 on voluntary foster care placement. It placed John in different foster homes in Bemidji, afterwards notifying the Tribal Court of the placements.

When John was transferred to the reservation, the roles of the County and the Tribal Court changed for several reasons. First, the applicable state law changed. The placements were no longer voluntary. The Tribal Court took legal custody from

the parents and granted it, on a temporary basis, to Mr. and Mrs. Wind as foster parents. The parents could no longer demand John's return, but instead had to proceed through the Tribal Court. Consequently, the statutory requirements for the County on voluntary foster care placement (§ 257.-353) were no longer applicable.

Secondly, both the federal and state provisions in child custody proceedings came into play. Parental rights were not terminated, but legal custody was temporarily transferred to the foster parent. Clarence Sayers and Janet Blue retained the right, as parents, to have John visit home on weekends. And most significant for our purposes here, the Tribal Court had exclusive jurisdiction over the proceedings, although it was authorized to enter into agreements with the state on care, custody and jurisdiction if it so desired. See 25 U.S.C. §§ 1911(a), 1919(a); Minn.Stat. § 257.354, subd. 1.

The issue before us, then, is whether transfer of the child to the reservation under the jurisdiction of the Tribal Court bars a negligence suit against the County. The trial court thought so but the court of appeals majority felt the opposite. The answer depends, we think, on whether the Tribal Court agreed to share its jurisdiction with the County as authorized by 25 U.S.C. § 1919(a). If there was some agreement, we think this record requires a distinction between child placement and child care.

Nothing in the record suggests that the Tribe delegated to the County any authority on *placement* of the child. Tribal Social Services alone handled licensure of foster homes on the reservation. It was responsible for questioning potential foster parents, inspecting the home, and ultimately deciding whether or not to license the home. Moreover, the Tribal Court maintained exclusive authority on where to place John Sayers. The record shows that Clarence Sayers dealt with the Tribal Court, not with Beltrami County, on placement. The County had no authority or role in the placement decision, and it was not its decision to make, although it did furnish Tribal Social Services with copies of the child's psychological records.

The court of appeals dismissed the negligent placement claim on the grounds of discretionary immunity. In our view, the issue of discretionary immunity need not be reached. As a matter of law, Beltrami County owed no duty to John Sayers on his placement in a foster home on the reservation, and we so hold.

As to the claim of negligent supervision, it appears there was an informal understanding between the Tribe and the County for the County to provide care and supervision for John after his placement in the Wind home on the reservation. Such an arrangement was consistent with 25 U.S.C. § 1919(a). Betty Curran testified (in her discovery deposition) that, if an Indian child was initially placed in foster care off the reservation and the case was then transferred to the reservation, Beltrami County would continue to work with the child after placement on the reservation. As previously noted, Beltrami County Social Services maintained a branch office on the reservation, which presumably was with the Tribe's approval. Finally, the fact of the matter is that Betty Curran, the County social worker, did work with John (as well as with the parents) while he was at the Wind home. True, the County could not remove the child from the Wind home. Only the Tribal Court could do this; but the County could, and did, provide supervisory care and assistance. Indeed, several years later when the Tribal Court attempted to have Tribal Social Services provide care for John Sayers, Tribal Social Services declined because of a lack of funds and resources.

In any event, the Indian Child Welfare Act does not bar a suit against the County. Under § 1919(a) of the Act, the Tribe and the County were authorized to enter into agreements whereby the County would provide supervisory care for a child placed by the Tribal Court in a foster home on the reservation. The record shows the Tribe and the County took advantage of this statutory authorization and had a long-standing arrangement for the County to provide

the kind of assistance that it provided in this case for John Sayers.

## II.

This leads, then, to the next question: To the extent the County assumed responsibility to provide reasonable supervisory care and assistance for John Sayers, is the County entitled to summary judgment for the manner in which it discharged that responsibility? We think so.

First of all, the County urges that we find that the doctrine of discretionary immunity protects the County from tort liability. This brings into play a whole variety of concerns, such as the extent of the Tribal Court's role, the availability of resources on the reservation, the role of the County, and any constraints due to the Indian Child Welfare Act and the Minnesota Indian Family Preservation Act. The dissenting judge on the court of appeals panel, in arguing for discretionary immunity, expressed a concern that exposure to tort liability might chill a county's willingness to assume supervisory care and assistance for children on the reservation. We conclude, however, that we need not reach this issue because as a matter of law there is no tort liability.

Plaintiff Sayers points to various state regulations as outlining the County's duty of supervisory care. Thus the court of appeals cites breach by the County of several regulations on foster care: certain training seminars; preliminary study; records of training. *Sayers v. Beltrami County*, 472 N.W.2d at 664 n. 7 (citing 12 Minn.Code Agency R. § 2.001 et seq., codified at Minn.R. 9545.0010 et seq.). These rules, however, are irrelevant; they apply only to licensure, for which the County here is not responsible. It is unclear if the other rules cited (12 Minn.Code Agency Rules § 2.204 et seq.) apply either; they appear to pertain only to homes that the County licenses.

Assuming arguendo that some of the regulations on foster family care apply, the County might be said not to have disclosed "pertinent health data" as required by Minn.R. 9560.0600, subd. D (1990). Argu-

ably, the County had a duty to disclose such data whether or not the rule governs. In addition, plaintiff Sayers argues negligence in other, unspecified acts of the County. Should Betty Curran have warned Eva Wind about the wringer washer or checked further about the child's hyperactivity? Having taken the child to a psychologist and a doctor for his behavior, and having furnished these reports to the Tribal Social Services, was she required to do more?

Viewing the record, it is difficult to see what the County could have done to avoid the accident. Eva Wind knew of John's hyperactivity without being told about it by Betty Curran. Eva Wind took precautions—she turned off the washing machine, warned John not to touch it, and took him with her into the house. John had always minded before in this situation.

Even had the County visited the home more often or been more attentive, it is still hard to conceive how that supervision would have prevented the accident. The County could not have social workers at the home all of the time, and it was entitled to rely on the common sense of the foster parents to handle common, household objects in a prudent manner with a child known to be hyperactive. One cannot expect to obviate all of the many potential hazards that may befall a child in a home. A county simply does not have the resources to always ensure that foster children will not suffer harm, just as parents cannot always avoid their toddlers' inevitable hurts.

We hold the County is not liable for John Sayers' injury as a matter of law. Assuming arguendo that the County failed adequately to inform Mrs. Wind of the child's hyperactivity, as a matter of law this failure, in view of Mrs. Wind's awareness of John's behavioral problems, was not a cause of John's injuries. As to other claims of negligence on the part of the County, no duty was breached as a matter of law.

Appellants' brief is in substantial noncompliance with Minn.Civ.App.R. 128.-

02, subd. 1(c) and (f); consequently, appellants are denied costs and disbursements in this appeal.

Reversed and summary judgment in favor of the County reinstated.